[No. 87. Decided September 17, 1890.]

H. L. YESLER et al. v. CITY OF SEATTLE et al.

MUNICIPAL CORPORATIONS — WATER WORKS AND SEWERS — BONDS — DATE OF ISSUE — ELECTIONS — ORDINANCES.

Although the charter of the city of Seattle (Laws Wash. 1886, p. 224) granting said city power to erect and maintain water-works, provided that no such works should be erected "until a majority of the voters of the city, at a general election of the city, shall vote upon the same," which clause is unrepealed by any later law, yet by the acts of February 26, and March 26, 1890 (Laws 1889-90, pp. 225, 520), authorizing cities to extend their indebtedness and construct, purchase and maintain water-works with the proceeds of long-time bonds, a new power is conferred upon said city, and the question of issuing bonds for such improvements may be submitted at a special election held for that purpose.

The act of March 26, 1890, entitled "An act authorizing cities and towns to construct internal improvements, and to issue bonds therefor, and declaring an emergency," under which the legislature empowers cities to construct and maintain water, light and sewerage systems, is not invalid on the ground that the subject of the act is not expressed in the title, as required by art. 2, § 19 of the constitution.

The act of March 26, 1890, authorizing the city council or board of trustees of any city or town to provide by ordinance for submitting to vote of the people plans for "either or both such water-works,

or system of sewerage, or plant or works for lighting purposes," is a general law applicable to all incorporated cities and towns, and clearly authorizes ordinances on this subject to be either single, double or triple; and accordingly suspends the restrictive clause in § 78 of the charter of the city of Seattle, that "no ordinance shall contain more than one subject, which shall be clearly expressed in the title."

The record of an ordinance was made by the city clerk from a correctly printed copy, the original having been lost. Subsequently the city attorney undertook to prepare a substitute for the original, but by mistake he worded it differently in some particulars. This substituted copy was signed by the mayor and clerk, and placed on file in the latter's office. Afterwards an assistant clerk, without authority from any one, erased and interlined the recorded ordinance to make it conform to the substituted copy. *Held,* That showing these facts was not the impeachment of a record, and that the ordinance, as originally recorded by the clerk, before the erasures and interlineations were made, was the true ordinance.

Where an ordinance provides that "if three-fifths of the voters of said city of Seattle shall at said election vote in favor of authorizing," etc., it does not require, in order to carry the proposition, that three-fifths of all those who may be entitled to a vote, should vote in favor thereof, but only a three-fifths majority of those actually voting.

Where the statute provided that, if the voters of a city duly assented thereto, the city might issue bonds to cover the cost of water, sewer and light systems, the bonds to run for not more than twenty years, with interest at not less than six per cent. per annum, principal and interest to be payable at such place as may be designated, and an ordinance of the city of Seattle submitting such a proposition to the voters thereof, provided that the bonds should be sold at par, bear five per cent. interest, and be payable at the office of the city treasurer, and the proposition was assented to by the voters of the said city in that form, the city council of said city may subsequently, in the absence of fraud, without again submitting the proposition to the people, provide by another ordinance that the bonds shall be sold at a discount, bear a greater rate of interest, provided the same does not exceed six per cent., and be made payable at a different place from that fixed in the original ordinance.

Where the statute requires that such bonds " shall bear the date of their issue," it is not a violation thereof for the bonds to be prepared and dated July 1st, 1890, and not negotiated until several months thereafter.

Where a statute required bonds to be signed by the mayor of the city, the person holding that office when the occasion arrived for

executing them would be the proper party to affix the official signature of the mayor, though the bonds bore date prior to his entry into office.

*Appeal from Superior Court, King County.*

The facts are fully stated in the opinion.

*Preston, Albertson & Donworth,* for appellants.

*Thomas R. Shepard,* for appellees.

The opinion of the court was delivered by

STILES, J.—In this appeal the matter of the issuance of the same bonds which were the subject-matter of the recent case of *Metcalf v. Seattle, ante,* p. 297, was again in controversy, the appellants seeking to enjoin the sale of the bonds to purchasers approved by the city council of the city of Seattle, upon the several grounds which will be stated and discussed in order.

1. Appellants maintain that, inasmuch as § 12 of the act incorporating the city of Seattle (Acts of 1886, p. 244) grants power to that city to erect and maintain water-works, provided that no such works should be erected "until a majority of the voters of the city at a general election of the city shall vote upon the same," the special election of June 4, 1890, was an invalid election, their contention being that, since the act of February 26, 1890, contains no authority to erect water-works, and the act of March 26, 1890, has no clause repealing conflicting laws, this requirement of submission at a general election still stands as the law of that corporation. But even were we to hold that there had not been a repeal of the quoted part of § 12 of the act of 1886, by reason of the rule that special acts of this class are not to be taken as repealed by general acts unless the intent to repeal is plainly apparent, it is equally apparent that the act of 1886 did not provide for the erection of water-works and the construction of sewers with the proceeds of long-time bonds, which the acts

of February 26, and March 26, 1890, do. Thus a new and distinct power is conferred by a method, the main and most beneficial feature of which is the relief of the present generation of taxpayers from excessive assessments, to pay cash for such public improvements; and whenever that feature is sought to be availed of, as it was in this instance, all the safeguards accompanying it must be adopted. One of these is the special election, and there was, therefore, no error in the proceedings on that score.

2. It is objected that the act of March 26th is invalid because the subject is not expressed in the title. Constitution, art. 2, § 19. The title is : "An act authorizing cities and towns to construct *internal improvements*, and to issue bonds therefor, and declaring an emergency," and the criticism is, that although there is a subject expressed, it is not the subject treated of in the body of the act, since water-works, sewers and artificial light plants are not " internal improvements " within the ordinary meaning of the phrase. Perhaps this is an original use of the term " internal improvements." It has, certainly, not been commonly applied to the improvements supposed to be made by cities for the benefit of their inhabitants, but has been employed more grandiloquently in reference to the improvement of highways and channels of travel and commerce, in the statutes of congress and the state legislatures. And yet, when under it our legislature particularizes water-works, sewers and light plants, which certainly are, in fact, internal improvements, relatively to the cities of the state, we do not deem the verbal criticism of sufficient weight to set aside the act. The cases cited, *Union Pacific Railroad v. Colfax Co.*, 4 Neb. 450, and *Dawson Co. v. McNamar*, 10 Neb. 276, are not in point, since these were instances of the issuance of bonds for purposes not particularized in the statute, which was a general one authorizing counties to issue bonds in aid of railroad and other internal improvements.

3. The act of 1886, § 78, contains the usual restriction that "no ordinance shall contain more than one subject which shall be clearly expressed in its title;" wherefore it is asserted that ordinance No. 1343 was void because both in its title and in the subject treated of it was double, in that it provided for both water-works and sewers. And, in so far as the double subject is concerned, our judgment is with the appellants; for both in the constitution and the statute water-works and sewers are distinct things; and it would probably be better that in all cases, propositions for either of these improvements, as well as for lighting systems, should be submitted either at separate elections, or separately at the same election, so that the voters might be free to adopt one system without being forced thereby to adopt the other, or to reject one without losing the other. But the restrictive clause of § 78 of the act of 1886 has no effect upon that portion of the act of March 26, 1890, which provides for submitting propositions to the voters of cities, since the latter act, by its own terms, contained in § 2, suspends the restriction. Section 2 says: " Whenever the city council, or board of trustees, of any such city or town shall deem it advisable that the city or town of which they are such officers shall exercise the authority hereby conferred upon them in relation to *either or both* such water-works, or system of sewerage, or plant or works for lighting purposes, the corporation shall provide therefor by ordinance," etc. This is a general law applicable to all incorporated cities and towns, and is to be executed in the same manner wherever it is made use of. It has become a part of the charter of each city and town; and on this subject clearly authorizes ordinances to be either single, double or triple.

4. The next proposition in the case embraces questions of mixed law and fact. The complaint alleged that the ordinance had never been published as required by § 79 of the charter (act of 1886); but it was admitted at the hearing that a publication had been made, excepting that, whereas

§ 6 of the ordinance adopted by the council and approved by the mayor, as appeared from the clerk's official record, had provided that the proposed works should be entered upon, "if three-fifths of the *qualified* voters of said city of Seattle *voting* at said election vote in favor of authorizing" the same; on the other hand, the attempted publication had represented § 6 as conditioned that "if three-fifths of the voters of said city of Seattle *shall* at said election vote in favor of authorizing" the same.

The answer alleged, and the court below, over appellant's objection, permitted the appellee to show that the ordinance was passed and approved in the words of § 6, as admitted to have been published, but that, through haste in procuring publication, the city clerk had permitted the printer to take the original sheets of the ordinance to be used as copy for the newspaper type-setters, before the ordinance had been copied into the record book; that the printer had separated the sheets, perhaps cut them up, and ultimately lost them; that the clerk had preserved one of the newspaper copies, as officially published, and from that made his copy in the ordinance record book; that some time after this, through the frequency of calls for the original ordinance by third persons, the attention of the mayor and city attorney was drawn to the fact that it had been lost, and the city attorney undertook to make a substitute original copy, which was to be signed by the mayor and clerk, dated and filed as of the date of the original, and to be to all appearances, the original itself; that the city attorney mistook a prepared draft for an ordinance which he had in his office, for a verbatim copy of the one adopted, and prepared his substitute copy from that, instead of from a printed copy; that this substitute, containing the variations noted, was signed by the mayor and clerk, and dated and filed as proposed, and was for some time treated as the true original; and that an assistant in the office of the clerk, after the substitute copy had been deposited in the files of the clerk's office, noticed

the discrepancy between it and the recorded ordinance, and without authority or instruction from any one, interlined in the record the word "qualified," and erased the word "shall" and interlined the word "voting" in its place. The appellant's objection to proof of these facts was on the ground that the record of the ordinance could not be collaterally impeached. Dill. Mun. Corp., §§ 297–299. But we hold that this was not a case of the impeachment of a record, but merely to determine what was the record. The substitute copy made by the city attorney was certainly not a record; and no more were the interlineations and the erasure made by the unauthorized assistant clerk a part of a record. The testimony went to show these facts, and to establish what was the true record, viz.: the ordinance as copied into the record book by the clerk, from the printed copy, before the erasure and interlineations were made; and this, in our judgment, was entirely competent. This leaves the ordinance reading: "If three-fifths of the voters of said city of Seattle shall at said election vote in favor of authorizing," etc., which, it will be observed, is not the language of it as presented in *Metcalfe v. Seattle*. Appellants, therefore, confidently claim that, since it is admitted that there were over four thousand persons in Seattle entitled to vote on the 4th day of June, 1890, and less than eight hundred did, in fact, vote, the authority to bond the city for water works and sewers was not granted. But, under our construction of the word "voter" in *Metcalfe v. Seattle*, and the authorities there cited, we see no difference whatever in meaning, between "if three-fifths of the voters shall vote," and "if three-fifths of the qualified voters voting vote." The word "qualified" adds nothing. Every voter is a "qualified" voter. And if a voter is one who votes, then, at an election, he is a "voter voting." It was competent for the city of Seattle to be more particular than the statute and provide that, before the proposition for public water works and sewers pass, it should be authorized by the affirmative

vote of a majority of all the persons entitled to vote; but unless it has done so in clear and indisputable language it should be taken to have accepted the act of March 26th, as the legislature enacted it; and, in view of the eagerness with which the legislative body of the city have pursued the matter, we deem it not likely that it would seek to make the way to the issuance of these bonds more difficult than was necessary under the law.

5. The ordinance, in addition to the systems of water works and sewers set forth, declared the probable cost, and proposed the issue of bonds for $955,000. This was required by § 2 of the act of March 26th. But the ordinance went much further, and enacted many other things not necessary to it as a complete ordinance for submission. The place of payment was fixed at the office of the city treasurer; the rate of interest was made five per cent.; and it was ordered that the bonds be disposed of at not less than par. Now, it is contended by appellants that every feature of the ordinance, by its submission to the voters, became a condition precedent to the lawful issue of the bonds, under the authority conferred by the result of the election. Were this point held good, it will be seen that the whole scheme would be very effectually blocked, for the present at least. It appears that in accordance with the authority contained in the ordinance, the mayor and the finance committee of the council, as soon as the election of June 4th had ratified the action of the council, prepared to have the bonds lithographed, and advertised them for sale as bonds of date July 1, 1890, running twenty years, at five per cent., interest on the first coupon from July 1st to delivery to be deducted. The time set for receiving bids was July 8, 1890; but neither at that time nor at any subsequent date could any person be found to take the bonds on the terms offered, the rate of interest being lower than the market commanded for that class of securities. On the 19th of August, however, one N. W. Halsey, who was in the employ of the firm of N. W.

Harris & Co., offered, on behalf of Harris & Co., to purchase the whole issue of bonds, providing that terms could be made so that, in effect, the rate of interest could be raised to about five and one-third per cent. The experience of the mayor and finance committee had convinced them and the council that a five per cent. bond could not be negotiated at par, and they were willing to accept the offer of Harris & Co. But both parties to the transaction were fearful that the provisions of the ordinance were binding upon all action taken in furtherance of the issue of these bonds, and they therefore resorted to a series of clumsy fictions to avoid the effect of the requirements as to the rate of interest and selling at par, the excuse on the part of the city officials being the pressing need of the people for a larger supply of water and better sewerage, the delay and expense of another election, and the fact that the credit of the city had already been pledged to a large amount for water machinery on the faith that the proceeds of these bonds would be immediately available. Harris & Co. offered to take the entire issue of $955,000, paying $350,000 cash; $50,000 October 1st, $50,000 November 1st, and $505,000 after January 1, 1891, in installments of not less than $10,000 nor more than $50,000, as the funds should be actually needed by the city, in paying for water and sewerage work, on estimates to be furnished by the engineers in charge, with fifteen days' notice of a call for each installment; all interest coupons from the date of the bonds, July 1, 1890, to remain attached to the bonds uncanceled. They further required that a commission of two per cent. of $955,000 be forthwith paid to Halsey, in a warrant on the general fund of the city, and that a warrant of the city of Seattle for $19,100 be accepted as part of the first payment of $350,000 to be made by them. The place of payment was to be changed to some national bank in the city of New York.

We agree with the appellants that all of this maneuvering was simply a scheme to give the bonds to Harris & Co.

at a discount, and the appellee substantially concedes such
to be the fact.   In the first place the commission to Halsey,
who was the authorized agent of Harris & Co., was a rebate
to the purchasers of $19,100 from the face of the first
$350,000; and secondly, the retention of all coupons was
an advance payment of interest to the extent of some
$43,000, for a period during which Harris & Co. would
still retain the purchase money and have the full use of it;
so that the effect would be that the city of Seattle, in twenty
years, would pay about $62,000 more for the use of the
money than it would had the bonds been sold in strict ac-
cord with the terms of the ordinance.   This, doubtless, was
the moving cause of the appellants' suit, and is the most
strongly urged of all their grounds of complaint.   The
council, by ordinance, to the formality of which no objec-
tion is raised, accepted the proposition of Harris & Co.,
caused a warrant for $19,100 to be drawn on the general
fund in favor of Halsey (which was immediately endorsed
to Harris & Co,, and by them, through Halsey, turned in
on their first payment), and were proceeding to the execu-
tion of the bonds when this action delayed all further steps.
Unless we hold that this change of plan by the council was
not expressly or implicitly forbidden by the law governing
their action, the injunction asked should be granted.   We
observe, at the outset of this part of the case, that no fraud
whatever is alleged against the council, or any of its mem-
bers; nor was there any attempt to avoid the effect of any
part of the statute, unless it be what is claimed to be its un-
written part, binding the council to every provision of
ordinance No. 1343.

Municipal corporations are almost invariably invested
with the power to borrow money.   Very eminent jurists
have maintained that this power was inherent with the idea
of a corporation, and needed not to be granted specially.
But the rule is settled otherwise, and now, aside from con-
stitutional and statutory limitations, courts demand some

charter provisions on this subject before they will recognize indebtedness of this kind. The power to become indebted being made apparent, however, courts are liberal in their construction of statutes and constitutional provisions couched in general language, so long as the purposes for which indebtedness is created are clearly seen to be municipal in their character. The standard for a county is, however, measured by the objects of its incorporation; that of a school district by an entirely different set of objects; and that of a city or town by the peculiar and infinitely varied needs of their inhabitants, circumscribed by reasonable bounds. Usually the wisdom of incurring debt by these corporations is delegated to the legislative authority of each, though there have been exceptions, in which corporations have been required by the legislature to issue bonds for purposes foreign to their organization, and there is a numerous class of instances in which it is common to submit propositions to the electors of the corporation, and thus delegate to the body of the people the power to say whether a debt shall be incurred or not. This latter class, however, is generally limited to cases where the object to be promoted is not within the purview of legitimate corporate purposes, though it is of a *quasi* public nature. Our constitution, in the most positive terms, has cut off from every municipal corporation every subject of expense and indebtedness excepting those which are within the legitimate intendment of its organization; and so far as cities are concerned, it has gone to the extreme of restriction, by fixing the one and one-half per cent. limit, beyond which the legislative bodies of those corporations cannot incur valid indebtedness without the assent of their constituents. The act of February 26, 1890, undertakes to confer upon existing cities the power to become indebted up to the limit prescribed by § 6, art. 8, of the constitution; and, upon examination, we find that until the five per cent. limit is reached the council have delegated to them the whole matter of how, and for

how long, and at what rate of interest loans shall be negotiated, and all of the details; and this is with reason, since these are business corporations, acting, as a general rule, only through their legislative head, and it is not practicable to submit details to the body of voting inhabitants. True, when one and one-half per cent. has been reached, the people must be consulted as to further borrowing of money or contracting indebtedness, but the method and other details are entirely left to the council, unless water-works, sewers or light plants are contemplated, when the act of March 26th makes some modifications.

Now the power is thus delegated to the municipal legislature, with the assent given, to proceed and "borrow money" or "contract indebtedness," it being the sole judge of the proper method, whether by bonds, or warrants, or open account, confidence being reposed in the wisdom and honor of its members that they will act for the best interest of the community. No citizen or taxpayer can question, in the courts, the uncorrupted action of his city council in these particulars, as no stockholder can dispute the doings of the board of directors of a private corporation of which he holds stock, in the absence of fraud. Nor does the law permit the council of a city to delegate to the popular vote the determination of any matter before it, unless the right to so delegate it has been expressly conferred or enjoined by statute. Ministerial agents, with certain limited discretion, it may appoint, but that is all. Now turning to the act of March 26th, we find that the legislature saw fit to enlarge somewhat on the requirement that the assent of voters should be secured to the proposition to borrow money or become indebted for water-works, sewers or light plants, and prescribed that before the vote should be taken the plan of operation should be adopted and the probable cost estimated and certified to by the council, in the form of an ordinance. Here is a mandatory delegation to the popular voice by the legislature itself. It is not in

the discretion of the council to submit the question to vote or not; the council is merely the medium by which the wish of the people in the matter is recorded. Therefore, we conclude that the council could lawfully submit to vote only those matters directed to be submitted by its superior authority, the legislature.

Appellants urge that to be consistent with our decision in *Metcalfe v. Seattle* we must hold with them, since in that case we said, in reference to the act of March 26th: "The intention of the act was, that the people who would have to furnish the means should be fully apprised of the whole scheme, and that there should be a definite, well considered and practicable scheme presented for their rejection or adoption," they maintaining that the "scheme" submitted was to borrow $955,000, net, running at five per cent. interest. But in using the word "scheme" in the former opinion we had no reference to any matter connected with the bonds themselves. Nothing of the kind was involved in the case, and our use of the term was as a synonym for the phrase, "system or plan" employed in § 2 of the act, and related wholly to the physical features of the proposition, not to the financial means of accomplishing them. Touching that point, the people have a guaranty in the further provisions of the statute that bonds must be payable in not more than twenty years, and bear interest not exceeding six per cent.

It follows that we hold the rate per cent., the sale at par, and the place of payment not to have been necessary to the ordinance; but the question remains whether having been placed there, they must remain as the unchangeable rule of the council's action. We are cited to a number of cases which are presented as sustaining the affirmative. *State of Illinois v. Delafield*, 8 Paige, 527, held that a sale of bonds, nominally at par, but allowing accrued interest to the purchaser, was not really a sale at par, where the statute expressly required the par value to be realized. We

have held that the plan here proposed would not be a sale at par. *Cowdrey v. Caneadea*, 16 Fed. Rep. 532, fairly represents the other cases cited, all of which, without exception, are cases growing out of the issue of municipal bonds in aid of railroad or other *quasi* public corporations; and the judge in that case clearly states the ground of difference in the treatment of bonds of that class, and those issued for purely municipal purposes. He says: "The authority of a majority of the tax-payers of a town to incumber the property of a minority against their will, in aid of a railroad or other corporation, receives no countenance from the principles of the common law. Every step, therefore, required by the statute must be in strict conformity therewith." In *Lawson v. Schnellen*, 33 Wis. 288, the statute required the written proposition of the railroad company to be submitted to a vote of the people, and the court held that if the proposition was assented to it became a contract which could not be altered by county commissioners. *Douglas Co. v. Walbridge*, 38 Wis. 179, was of the same character. *Jackson Co. v. Brush*, 77 Ill. 59, held that railroad aid bonds should not be delivered until the conditions precedent, which had been made a part of the contract between the county and the company, had been fully complied with.

The remarks of High on Injunctions, vol. 2, § 1289, and of Dillon on Municipal Corporations, § 91, and Dillon on Municipal Bonds, §§ 6, *et seq.*, are all directed to this class of corporation aid bonds, the latter volume being entirely devoted to them; and the gist of these cases and authorities so far as they have any bearing here, is, that if a railroad or other company is aided by such bonds, the propositions submitted to the vote of the people, whether originating in the statute or with the municipal agents, or from the corporation, became a part of the contract between the two corporations, and follow the bonds as the law of their issuance. But here we have no element of con-

tract whatever, and the authority of a majority of the voters to encumber the property of the minority, even against their will, in furtherance of municipal objects and improvements, receives the broadest countenance from the principles of the common law. There is no reason, which commends itself to our judgment, for holding that those parts of ordinance 1343 referring to the details of the negotiation should be inviolate, and not subject to amendment in the manner adopted when it was found that no one would take five per cent. bonds at par. We still have to consider the alleged post-dating of the bonds; but, aside from that, it is conceded that the motive of those engaged in the transaction was fair, and the actual result to the city of Seattle was a rate of interest higher by about one-third of one per cent. per annum, and two-thirds of one per cent. less than the rate recognized by the statute. It would certainly have been far better had the council, seeing their dilemma, met the fact that five per cent. bonds could not be marketed at par with a new ordinance authorizing their negotiation at the best rate obtainable under six per cent. They would have been subjected to far less criticism, and the record here would have been much less involved.

6. The statute requires that such bonds shall "bear the date of their issue," and it has become a question in this case what the date of issue is, since the bonds were prepared with the date July 1, 1890, and the contract with Harris & Co. requires that the coupons remain intact from that date, although none of the bonds have been delivered, and some of them will not be delivered for many months. In financial parlance the term "issue" seems to have two phases of meaning. "Date of issue," when applied to notes, bonds, etc., of a series, usually means the arbitrary date fixed as the beginning of the term for which they run, without reference to the precise time when convenience or the state of the market may permit of their sale or delivery,

and we see no reason why the act of March 26, 1890, should not have that interpretation. When the bonds are delivered to the purchaser, they will be "issued" to him, which is the other meaning of the term. Usually the question of interest from the date of issue to the time of sale of bonds is adjusted by payment of the face and interest by the purchaser, or the removal of coupons. But here the contract stipulates that the coupons shall remain uncanceled; it was a fair contract, and there can be no wrong done if the term of some of the bonds in the hands of purchasers is something less than twenty years. No officer has sought to evade any statute affecting these bonds which came into operation since the date of issue, as was the case in *Anthony v. County of Jasper*, 101 U. S. 693; nor did a person, not an officer of the corporation at the time of signing, affix his name to the bonds, as an officer, to avoid the refusal of the acting officer to sign, as occurred in *Coler v. Cleburne*, 131 U. S. 162. Under the circumstances, the date July 1st was not an unreasonable date, and complied with the law in that respect.

7. The act of March 26th, among other formalities, required the bonds to be signed by the mayor of the city; but pending the disposal of bonds a municipal election was held July 14th, at which Harry White was elected mayor. As he was not the mayor July 1st, appellants maintain that he cannot consistently sign them under that date of issue. But if the bonds are valid, although not executed and delivered at the precise date of issue, it follows that the officer in office when the occasion arrived for executing them would be the proper party to affix the official signature of the mayor. In *Weyauwega v. Ayling*, 99 U. S. 112, the bonds of a town bore date June 1st, and were signed by the chairman of the board of supervisors, and by the town clerk; but the person signing as clerk did not sign until July 13th, at which date he had ceased to be town clerk. Still the supreme court held the bonds good, presuming that

the bonds were delivered with the assent of the then clerk; certainly a far more extreme case than that under consideration. *Coler v. Cleburne*, 131 U. S. 162, seems to be, in some of its features at least, on all fours with this case. The city of Cleburne, Texas, in September, 1883, contracted to pay city bonds for the erection of water-works, the bonds to bear date January 1, 1884. The works were not ready for acceptance until July 3, 1884, when the person who had been the mayor on January 1st, had gone out of office, and his successor was acting. The statute of Texas required such bonds to be signed by the mayor; but the city council argued that the mayor at the date of the bonds should sign them, even though he had gone out of office, and they passed a resolution requesting him to sign them, with which he complied. An innocent holder had brought suit upon unpaid coupons of these bonds; but the supreme court held, without dissent, that no person but the mayor of the city could lawfully sign the bonds, although thus formally requested to do so by the council, and that they were therefore void. The court, however, nowhere hints that, because the term of the mayor in office January 1st, had expired in April, no bonds bearing date January 1st, could be issued by the city of Cleburne, and we have found no authority sustaining such a proposition.

Upon all this branch of the case, we can frame no better reason for our judgment for the appellee than is contained in § 6 of the act of March 26th, in the words, "such bonds shall be sold in such manner as the corporate authorities shall deem for the best interest of the city or town."

The judgment of the superior court is affirmed, with costs to appellee.

HOYT, SCOTT and DUNBAR, JJ., concur.

ANDERS, C. J., not sitting.