[No. 1223.   Decided March 9, 1894.]

E. M. HUNT, *Appellant*, v. A. V. FAWCETT *et al.*, *Respondents*.

COUNTY INDEBTEDNESS — RATIFICATION — FUNDING BONDS — POWERS OF COMMISSIONERS.

The valuation of property in a county for the purposes of state and county taxation becomes fixed and certain, not upon the adjournment of the county board of equalization, but upon the completion of the equalization of values by the state board.

Under Laws 1893, p. 181, §1, provision is made for the ratification of such invalid county indebtedness only as was incurred prior to March 9, 1893, the date that said act took effect.

The joinder in one proposition for submission to the voters for ratification of indebtedness which cannot be validated with that which may be vitiates and renders nugatory the entire proceeding.

Under Laws 1893, p. 181, §2, a proposition submitted to the voters of a county for the purpose of ratifying its invalid indebtedness is illegal, when it does not specify the dates at or between which the different items of indebtedness were attempted to be incurred.

Where county commissioners are authorized to issue bonds for funding indebtedness without an election being held therefor, the fact that the bonds are issued pursuant to an election will not affect the validity of the issue.

A county is not authorized, under Laws 1889-90, p. 37, §3, after it has reached an indebtedness of one and one-half per cent. of the assessed valuation of its property, to borrow money upon an issue of bonds voted by the people and apply any of the proceeds to the redemption of its outstanding warrants within the one and one-half per cent. limit, for the purpose of issuing new warrants in their stead for current expenses.

The payment of a commission to the purchaser of county bonds is contrary to the provisions of the statute prescribing that such bonds shall not be sold at less than their par value.   (HOYT, J., dissents.)

( STILES, J., dissents.)

*Appeal from Superior Court, Pierce County.*

*Alfred E. Buell*, for appellant.

*Snell & Bedford*, for respondents.

The opinion of the court was delivered by

ANDERS, J.— The appellant, a taxpayer of Pierce county, by this action seeks to restrain the respondents, as the board of county commissioners of said county, from issuing negotiable five per cent. twenty year bonds of said county in the sum of $300,000, or delivering the same to the Imperial Loan & Trust Company, a corporation, in pursuance of a contract of sale entered into between said board of commissioners and said company.   The respondents demurred to the complaint, and their demurrer was sustained by the court and the action dismissed.

It appears from the complaint, the material allegations of which are admitted by the demurrer, that between the 12th day of September, 1892, and the 3d day of May, 1893, inclusive, the board of county commissioners of Pierce county entered into contracts for finishing and furnishing the new court house, and thereby attempted to incur indebtedness against said county to the amount of $42,-298.60, and during the same period of time, issued warrants on the general fund for current expenses to the amount of $68,028.32.   At the time this indebtedness was so attempted to be incurred, the indebtedness of the county had already reached the limit of one and one-half per cent. of the taxable property therein, and the attempted indebtedness in question had not been assented to by three-fifths of the voters voting thereon at an election held for that purpose, and was, therefore, invalid.   Const., art. 8, § 6.

On May 17, 1893, the board of commissioners of said county passed a resolution to submit to the voters of the county the question of validating the aforesaid attempted indebtedness at an election to be held on June 20, 1893, in accordance with the provisions of the act of March 9, 1893 (Laws 1893, p. 181), and also the further question of authorizing the said board of county commissioners to

issue negotiable bonds of said county in the amount of $300,000, above the limit of one and one-half per cent. indebtedness allowed by the constitution to be incurred by the commissioners for the purpose of procuring money to fund outstanding warrants so as to reduce the indebtedness incurred by the commissioners below the said limit, said bonds to draw five per cent. annual interest and to be payable in gold coin in twenty years from date thereof.

Pursuant to the foregoing resolution, an election was held on June 20, 1893, at which three propositions were submitted to the voters, as follows: (1) To validate the court house contracts entered into between September 12, 1892, and May 3, 1893. (2) To validate warrants issued between those dates. (3) To authorize the commissioners to issue $300,000 of five per cent. gold bonds, above the limit allowed by law to be incurred without a vote of the people, for the purpose of procuring money to fund outstanding warrants. Each of these propositions received the assent of more than three-fifths of the voters at said election.

On November 11, 1893, the commissioners entered into a contract with the Imperial Loan & Trust Company, which, upon certain conditions therein specified, binds the Trust Company to take bonds in the sum of $300,000 at par and accrued interest, and by which the county is bound to pay the company the sum of $14,750, "as and for expenses and commissions." These bonds recite upon their face that they are issued under the county funding act of March 21, 1890, and in pursuance of the election held on June 20, 1893. The commissioners are proposing to sell the bonds under this contract and to use the proceeds to pay outstanding warrants, some of the warrants to be paid being part of the indebtedness attempted to be validated, and then to incur further indebtedness under the claim that this $300,000 debt must not be reckoned in estimating

the one and one-half per cent. limit which may be incurred without the assent of three-fifths of the voters of the county.

It appears from the pleadings that only such indebtedness as was incurred after the assessment of 1892 became operative was invalid, and it therefore becomes important to ascertain that date. It is claimed by the appellant that it was the 20th day of August, 1892, because upon that day the county board of equalization adjourned and the rolls were footed. But we are of the opinion that said assessment did not take effect until October 15, 1892. On that day the work of the state board of equalization was completed, and then, and not until then, did the value of the property in the county, for the purposes of state and county taxation, become fixed and certain. See *Culbertson v. Fulton*, 127 Ill. 36 (18 N. E. 781).

It must be conceded that all indebtedness attempted to be created against the county by the commissioners, after the assessment of 1892 became effective, was void, because the then existing indebtedness of the county was greater than one and one-half per cent. of the value of the taxable property therein, as shown by that assessment. This void indebtedness could only be made valid by legislative authority (*Rehmke v. Goodwin*, 2 Wash. 676, 27 Pac. 473), and such authority was granted by the act of March 9, 1893. Laws 1893, p. 181. Was it, or any part thereof, validated by the election of June 20, 1893, which was held for that purpose? The respondents contend that all of the indebtedness attempted to be created by them, not only before but after March 9, 1893, and up to and including May 3, 1893, was thereby ratified and thenceforth became, and now is, a legal obligation of the county. On the other hand the appellant insists — (1) That all indebtedness attempted to be created after March 9, 1893, when the validating act took effect, was not, and could not be, vali-

dated, and (2) that the joinder of this indebtedness which could not be validated with the indebtedness incurred prior to the passage of the statute, in the propositions submitted to the voters at the election, vitiated and rendered nugatory the entire proceedings.

We entertain no doubt of the correctness of appellant's first proposition. The first section of the statute conclusively settles that question, for it is therein provided that —

"Any county in this state may ratify, in the manner prescribed in this act, the attempted incurring of any indebtedness of such county by the issuing of warrants, making of contracts or creation of other evidences of indebtedness on the part of such county by the board of county commissioners or other officers of such county at any time prior to the time when this act shall take effect," etc.

This statute is essentially a curative statute, and is only operative upon past transactions. It grants no license to create debts, but it provides in clear and explicit language, the only method whereby indebtedness honestly attempted to be created for legitimate purposes may be ratified; and an examination of its provisions constrains us to yield our assent to appellant's second proposition also, and to conclude that none of the indebtedness attempted to be incurred has been legally ratified.

The second section of the act under consideration provides that—

"Whenever the board of county commissioners of any such county shall deem it advisable that the ratification authorized by this act shall be obtained, they shall provide therefor by resolution, which shall specify separately the amounts of each distinct class of such indebtedness proposed to be ratified, with the date of the attempted incurring thereof, or, if any such class shall be composed of more than one item, the dates between which the different items were attempted to be incurred, and the general nature of the indebtedness comprised in each such class."

Now, while the submission to the voters in this case specified the different *classes* of indebtedness proposed for ratification, it failed to specify the dates at or between which the different items of indebtedness were attempted to be incurred, or the dates of the attempted incurring of any distinct class capable of ratification. It is claimed, however, on behalf of the respondents, that the indebtedness attempted to be contracted prior to March 9, 1893, was certainly ratified even if that created subsequently was not. But it is a sufficient answer to that contention to say that no such proposition was submitted or voted upon; and besides, to hold that the indebtedness contracted between September 12 and March 9 was ratified, and the balance not ratified, would be to create a class of indebtedness not specified in the resolution of the commissioners. It may be true that the indebtedness attempted to be incurred before March 9 can be separated from that which was attempted to be incurred after that date, but we have no means of knowing that the electors would have ratified the former if it had been separately submitted to them. It is certainly true that the voters of Pierce county have never voted to validate that indebtedness, and until they have so expressed themselves the indebtedness is void.

The appellant further contends that the county funding act of March 21, 1890 (Laws 1889–90, p. 37), gives no authority to hold an election to authorize the issuing of bonds for funding purposes; and we concede that no such power is thereby expressly given. Under that act valid indebtedness may be funded without a vote of the people. *Murry v. Fay*, 2 Wash. 352 (26 Pac. 533).

But it does not follow that, because county commissioners are authorized to issue bonds for certain purposes whenever they may deem it advisable to do so, without first submitting the question to a popular vote, bonds issued for the same purposes are necessarily rendered invalid by

26—8 WASH.

reason of the fact that their issuance was in accordance with the will of the voters as expressed at a formal election. That merely doing more than is necessary to accomplish a particular thing will not destroy the effect of that which it was necessary to do, is a self-evident proposition.

If, therefore, the bonds in question were designed merely to fund valid existing indebtedness contracted under §§ 1 or 2 of the funding act, their validity could not be successfully questioned. Nor are they invalid if issued for the purpose of procuring money for any other strictly county purpose, under the provisions of § 3 of that act. And the respondents claim that the purpose for which they propose to issue them is a strictly county purpose. That may be technically true, but we fail to find anything either in the constitution or the statutes authorizing them to treat these bonds, if issued and sold, as constituting no part of the amount of the one and one-half per cent. of the taxable property of the county, to which the commissioners are limited in contracting indebtedness at their own discretion.

It is plainly stated in § 2 of the funding act, that the entire indebtedness of any county shall not exceed in amount five per centum of the taxable property therein, and the language of the constitution is equally explicit. Art. 8, § 6. Under our law, whenever the *existing indebtedness* of a county, whether evidenced by bonds or warrants, reaches the one and one-half per cent. limit, no further debts can be contracted without the assent of three-fifths of the voters of such county at an election held for that purpose. It follows, therefore, that the claim of the respondents that they have a right to dispose of these or any other bonds and use a part or all of the proceeds to redeem the indebtedness of the county evidenced by outstanding warrants below the one and one-half per cent. limit, and then issue other warrants to pay current expenses until the amount of such warrants equals said limit, is utterly without foun-

dation.    No doubt it would be convenient for the various
boards of county commissioners to have at all times dis-
cretionary control of indebtedness equal to one and one-
half per cent. of taxable property; but a power so clearly
withheld by the legislature cannot be conferred by the
courts.

Lastly, it is urged on behalf of the appellant that the con-
tract between the Imperial Loan & Trust Company and
the county is illegal.    The statute prescribes that county
bonds may not be sold by the county commissioners at less
than their par value.    While the contemplated sale in this
case is nominally a sale at par, it is in fact a sale at a dis-
count and, therefore, within the inhibition of the statute.
To sell the bonds at their face value and at the same time
pay a large commission to the purchaser is not to sell at
par.    It is argued, however, by the learned counsel for the
respondents that, inasmuch as the county might have issued
seven instead of five per cent. bonds, and inasmuch as the
bonds as sold do not cost the county a greater rate of inter-
est than seven per cent. on the amount realized, the sale is
really not below par.    But the argument may be sufficiently
answered by saying that the validity of the contract must
depend upon its terms and not upon its ultimate effect upon
the county.

The judgment is reversed, and the cause remanded with
directions to overrule the demurrer.

DUNBAR, C. J., and SCOTT, J., concur.

HOYT, J. (*concurring*).—I think that the discount did
not invalidate the contract of sale, but concur as to the
other questions decided.

STILES, J. (*dissenting*).—Concerning the figures show-
ing the amount of the county's invalid indebtedness, I
think some correction should be made of the majority

opinion.   It is true that the complaint set out that between
September 12, 1892, and May 3, 1893, the commissioners
incurred a debt of $42,298.60 on account of the court
house, and of $68,028.32 by the issuance of warrants, all
of which was invalid; but it also shows that of these amounts
$14,650 of the court house debt and $43,524.44 of the
warrant debt was incurred *before* October 15, 1892.   Now
the valid debt limit up to the latter date was $919,672.02,
and the actual debt, including the last two items incurred
before that date, was but $761,533.75; so that those items
were lawfully incurred, since the court holds that the
change in the limit did not occur until October 15, and the
actual invalid indebtedness on May 3, 1893, was therefore
$52,134.48, instead of $110,308.92.

On the point made as to the commission contracted for,
I think it proper to say that this case differs from that of
*Yesler v. Seattle*, 1 Wash. 308 (25 Pac. 1014).   In that
case the statute invested the council with the authority to
sell the bonds as it should deem best for the interest of the
city; but here the bonds must be exchanged for an equal
amount of county warrants or sold at par.   Laws 1889–90,
p. 39, § 5.   This point alone would sustain the complaint
for an injunction against the sale of the bonds under the
contract, but it would not affect the validity of the issue
if sold at par under some other arrangement.

However, the principal result of the decision is to hold
the whole issue void, and to that proposition I cannot yield
assent.   I agree with the view which the court takes that
there is no such thing as voting an indebtedness which
shall remain suspended above the one and a half per cent.
limit, although all or a part of the indebtedness within that
limit shall be paid off, and that is about all that the court
seems to have decided.   But that was not the vital ques-
tion.   It is true that counsel for the county sought to have

this court declare that such an operation could be brought about. But it seems to me that that would be merely a question for future consideration when, after the debt outside of the bonds had been paid off so that with the bonds it would exceed the limit and without them it would not, the board should propose to incur further debt without a vote. Now, and here, the question is purely and singly whether these bonds have a legal basis for their issuance, without regard to what may be done with the proceeds, or what may be necessary in the future when it is desired to incur further indebtedness. In my judgment the trouble with them, if any, is found in the manner in which the vote was taken. The board first spread upon its records a recitation of the fact that it was necessary to provide for the running expenses of the county by reducing the outstanding indebtedness below the limit, and declared its intention to submit the question of issuing bonds in the sum of $300,000 above the limit for the purpose of procuring money to fund that amount of outstanding warrants.

This was a mere funding proposition if carried out, and required no vote, as held in *Murry v. Fay*, 2 Wash. 352 (26 Pac. 533), unless the plan of keeping the bond debt up in the voting limit of three and a half per cent. could be sustained, upon which the court is of the contrary view. Under *Murry v. Fay* the whole of the valid debt of $761,-533.75 could be funded by the commissioners, without an election, either by an exchange for warrants, or by sale of bonds and payment of warrants. But that operation would not have accomplished the purpose desired, viz., of procuring means for meeting current expenses. It could be accomplished only in one of two ways: either by authorizing an enlargement of the debt limit under § 2 of the act (Laws 1889-90, p. 37), or by borrowing money under § 3. If the former method were chosen the commissioners could

again fund the debt so created without further vote; but
under the latter they must issue bonds.    Now in full view
of the law and of the circumstances making it necessary to
either extend the debt limit or borrow money, the latter
plan was adopted, and the intention was announced to be
that of borrowing; and the only trouble with the plan exe-
cuted was that the proposal to borrow was coupled with a
declaration that the purpose of the borrowing was to fund
warrants.    This made it indefinite, and if literally followed
would have left the county in no better condition than be-
fore, for the money would all be paid out and the limit
would still stand where it was before, completely filled up.

But I cannot conceive that any voter could have been
misled into supposing that the debt limit was not to be in-
creased by $300,000; for on the ballot which he voted it
was expressly stated that this amount of bonds was to be
issued above the limit allowed without a vote.    Thus, I
think the authorization of the issue ought to be permitted
to stand.    It is somewhat irregular and unsatisfactory, I
frankly admit, but the ultimate purpose to borrow money
and increase the debt limit is so clearly apparent that no
one can have been deceived, and if so the loose declarations
of the commissioners ought not to defeat so important a
matter.