THE STATE OF KANSAS V. D. L. PIERCE *et al.*

1. COUNTY BOARD—*Power to Purchase Bridges.* Under the provisions of chapter 61, Laws of 1891, the county commissioners of Barber county, in this state, have no power to purchase any bridge built upon the public highways of that county, unless they pay for the same in county bonds or the proceeds thereof.

2. OLD BRIDGE—*True Value.* "True value," in said chapter 61, Laws of 1891, cannot be construed to mean the original cost of a bridge permitted to be purchased thereby, when such bridge, at the time of the proposed purchase, is about seven years old, and actually worth about one-sixth only of the original cost of construction.

3. COUNTY WARRANTS—*Unlawful Issue—Punishment.* Where no account, claim or demand is filed or presented against the county, and the board of commissioners unlawfully issue as county warrant or order in violation of ¶ 1888, Gen. Stat. of 1889, such action is an offense, within the meaning of the statute, and the members of the board may be punished therefor, under ¶ 1889, Gen. Stat. of 1889. (Gen. Stat. of 1868, p. 296, § 3.)

4. TO ISSUE—*Meaning.* To issue county warrants or orders means "to send out, to deliver, or to put into circulation."

*Appeal from Barber District Court.*

IN 1891, the legislature passed the following act:

"SECTION 1. That the county commissioners of Barber county, Kansas, are hereby authorized to purchase at their true value any and all bridges built upon the public highways of said county by any township or private person or persons, and pay for the same in county bonds. Said bonds not to draw over 6 per cent. interest, and made payable not under 10 years; or said bonds may be sold at not less than par, and the proceeds applied for the payment of said bridges." (Laws of 1891, ch. 61.)

On the 7th day of July, 1892, the board of county commissioners of Barber county made and entered of record the following order:

"Under and by virtue of the power and authority vested in the board of county commissioners of Barber county, Kansas, by an act of the legislature approved March 6, 1891, being an act entitled 'An act concerning bridges in Barber county,

Kansas,' it is hereby ordered by said board as follows: That the following-named and described bridges, situate and being in said county of Barber, be, and they are hereby, purchased at the prices and sums following, that is to say: The bridge across the Medicine river near the town of Kiowa, and known as the 'Kiowa bridge,' at the sum of $2,300; the bridge across Medicine river near the town of Sun City, and known as the 'Sun City bridge,' at the sum of $2,600; and the bridge across Medicine river near the town of Lake City, and known as the 'Lake City bridge,' at the sum of $2,680$\frac{93}{100}$.

"And whereas, the first two named bridges are township bridges for which the bonds of the respective townships are outstanding and unpaid, it is ordered, that hereafter the payment of such bonds, and accruing interest hereon, shall be assumed and provided for by the county, according to the true tenor and effect of such bonds, and the treasurer of said county is hereby authorized and directed to make such payment out of such funds as may be provided for that purpose.

"And whereas, the Lake City bridge was built by private persons, the amount of whose subscription and payments thereto, respectively, is satisfactorily proven and shown to the board to be as follows: [Here appear, in the order, the names of 78 persons who had subscribed various sums toward the building of the Lake City bridge, aggregating in all $2,680.93.] And it is therefore ordered, that warrants be drawn and issued and delivered to such persons for said sums respectively; and hereafter said bridge shall be treated as the property of the county, and cared for accordingly, or that bonds of the county be issued for said Lake City bridge.

D. L. PIERCE.<br>JAMES STRANATHAN.

"Attest:

F. A. LEWIS, *County Clerk.*"

J. M. Reagin, one of the commissioners, voted against the purchase of the bridges and also against the order adopted by a majority of the board. Before the order was made, Lyman W. De Geer, the county attorney of Barber county, filed with the county clerk of that county his written opinion, which concluded as follows:

"That you may avoid personal liability, and that the county may avoid the expense of future litigation, I respectfully submit this opinion, and briefly recapitulate as follows:

"1. You can only pay up to an amount equal to the true value of the bridges.

"2. You can only purchase such as were built on the public highways of Barber county.

"3. You can only pay for them in bonds, or the proceeds of bonds, to be issued by you for that purpose, and sold at not less than par.

"4. Said bonds can only be issued by you when 'ordered by a vote of the legal electors' of Barber county.

"5. A board of county commissioners can only issue bonds 'in a sum not greater than 5 per cent., inclusive of all other indebtedness, of the taxable property of their county.'"

This opinion was read to the board before action by it, and, before the order was made, J. M. Reagin, commissioner of the first district, moved that the opinion be accepted. This motion was voted down, J. M. Reagin being the only commissioner voting in favor thereof. Thereupon D. L. Pierce, commissioner from the third district of the county, and the chairman of the board of county commissioners, moved that the county buy the Lake City bridge, and issue county scrip to pay for the same. This motion was seconded by James Stranathan, county commissioner from the second district. The motion was carried by the vote of Pierce and Stranathan, but J. M. Reagin, one of the county commissioners, voted against the motion. About this time an order of injunction in the case of The State of Kansas, *ex rel.*, *v.* D. L. Pierce, James Stranathan, and J. M. Reagin, the board of county commissioners, was personally served upon each member, prohibiting them from purchasing any bridge in Barber county, or from paying for any bridge with county scrip, warrants, or bonds; and also prohibiting them from taking any steps towards the purchase of any bridge for the county. The next morning, July 8, at the request of D. L. Pierce, the county clerk commenced filling up and signing scrip for the various subscribers for the Lake City bridge. An order or warrant upon the county treasurer was signed in favor of R. Lake for $1,738.68. D. L. Pierce had a written order from R. Lake for this warrant, and the county clerk delivered the

same to him for Mr. Lake. It was taken by Pierce out of
the office, and delivered to Lake. There were also nine other
orders or warrants in favor of persons appearing upon the
subscription list of the Lake City bridge filled in by the
county clerk, and signed by D. L. Pierce, as chairman of the
board of county commissioners, but at the time of the trial
these were in the office of the county clerk, and had not
been delivered to any person. The only order or warrant
upon the county treasurer that was actually issued and deliv-
ered, under the order of the 7th of July, 1892, was the one
in favor of R. Lake for $1,738.68. On the 30th day of
July, 1892, Lyman W. De Geer, as county attorney of Bar-
ber county, filed in the district court of that county an in-
formation charging D. L. Pierce and James Stranathan,
members of the board of county commissioners of the county,
with certain misdemeanors in office. The information con-
tained 11 counts. The first count of the information charged
that the defendants unlawfully and fraudulently committed a
fraud in their official capacity, and under color of their offices,
as members of the board of county commissioners, in unlaw-
fully and fraudulently allowing greater sums on accounts,
claims and demands against Barber county than the amounts
actually due thereon, dollar for dollar, according to the legal
and ordinary compensation for prices and services ren-
dered, salaries and fees of officers, and materials furnished,
to wit: Claims in favor of R. Lake, J. H. Vinson, T. S.
Updyke & Co., Noah & Buck, John Andrews, James
Nurse, J. K. Garton, H. M. Buck, Charles D. Nelson,
A. Feltner, and other parties. It was alleged that said
accounts were allowed in an order made on the 7th
day of July, 1892, by the board, said order being one to
purchase the Lake City bridge. The second, third, fourth
and fifth counts of the information charged the defendants
with allowing accounts in favor of R. Lake, J. H. Vinson,
T. S. Updyke & Co., and Noah & Buck, respectively, with-
out said accounts being made out in separate items, and with-
out having been verified by affidavit setting forth that the

same were just, correct, and remained due and unpaid. The sixth, seventh, eighth, ninth, tenth and eleventh counts charged the unlawful issuance of county warrants to R. Lake, A. Feltner, C. D. Nelson, H. M. Buck, J. K. Garten, and James Nurse, respectively, without an account containing the several items thereof, verified by affidavit setting forth that the same were just, and remained due and unpaid, and that the amounts claimed thereon were actually due, according to the legal and ordinary price of services rendered and materials furnished, having first been presented to the board of county commissioners. Defendants filed a motion to quash the information upon various grounds, which was overruled by the court and excepted to at the time. A trial was had at the May term, 1893, of the court, and Pierce was convicted on the 11 counts of the information, and Stranathan upon the first five counts of the information. Motions for a new trial and in arrest of judgment were made, which were overruled and excepted to, and the defendant Stranathan was sentenced to pay a fine of $50 on each of the first five counts of the information, and Pierce was sentenced to pay a fine of $50 on each of the 11 counts of the information. Both defendants appeal.

*E. Sample, R. A. Cameron,* and *Chester I. Long,* for appellants.

*John T. Little,* attorney general, *Lyman W. De Geer,* county attorney, and *C. W. Ellis,* for The State.

The opinion of the court was delivered by

HORTON, C. J.: I. It is contended that chapter 61 of Laws of 1891 may be construed to permit the county commissioners of Barber county to purchase the bridges upon the highways of that county for county warrants or orders, and also that "true value" may be interpreted to mean the original cost or subscription price of the bridges. It is expressly provided therein that the bridges are to be paid for in county bonds, or their proceeds, the bonds not to draw over 6 per

cent. interest, and payable not under 10 years. Chapter 61 also expressly provides that the purchase of the bridges, if made, was to be made at their "true value." The Lake City bridge, which was attempted to be purchased, was about seven years old at the time of the order of the 7th of July, 1892. Its "true value" at the time was about $400. Its original cost was $2,680.93. In view of the express provisions of chapter 61, the county board had no authority to pay for the bridges with county warrants or orders, as there were no county bonds issued for that purpose, or any proceeds thereof to use. The board had no authority to buy the bridges at the original cost of their construction — an amount largely in excess of their "true value." The proceedings of the board on the 7th day of July concerning the purchase of the Lake City bridge at its original cost, and paying therefor by the issuance of scrip, was wholly outside of the act referred to; therefore, the defendants cannot invoke that statute for their protection.

II. It is next contended that the defendants ought not to be held personally or criminally responsible, because they claim they acted upon the advice of R. A. Cameron and A. J. Jones, two lawyers whom they consulted. The statute provides that

"The county attorney shall, without fee or reward, give opinions and advice to the board of county commissioners and other civil officers of their respective counties, when requested by such board or officers, upon all matters in which the county is interested, or relating to the duties of such board or officers, in which the state or county may have an interest." (Gen. Stat. of 1889, ¶ 1798; *Comm'rs of Leavenworth Co. v. Brewer*, 9 Kas. 317; *Huffman v. Comm'rs of Greenwood Co.*, 25 id. 64.)

The commissioners of a county have general charge of its business, but, under the statute, the county attorney is required to advise the board relating to its duties upon all matters in which the county has an interest. It seems that the advice of the county attorney of Barber county was not requested by the board, yet it was given to it, and subsequently an injunction was served prohibiting the members of the board from

purchasing or attempting to purchase any county bridge. (*The State v. Pierce*, 51 Kas. 241, 246.) This was done, as appears from the record, before any county warrant or order was issued to pay for the Lake City bridge. It has been decided by this court that,

"When the commission of an act is made a crime by statute, without any express reference to any intent, then the only criminal intent necessarily involved in the commission of the offense is the intent to commit the interdicted act; and in such a case it is not necessary to formally or expressly allege such intent, or any intent, but simply to allege the commission of the act, and the intent will be presumed." (*The State v. Bush*, 45 Kas. 139.)

This case, upon a rehearing, was modified, but only to the extent "that a slight departure from a directory provision of a statute, without any fraudulent intent, and which cannot injure anyone or defeat the purpose of the statute, is not unlawful." (*The State v. Bush*, 47 Kas. 201. See, also, 4 Am. & Eng. Encyc. of Law, 690; Whart. Crim. Law, 9th ed., ¶¶ 84, 1582.) Under these circumstances, we are unwilling to say that the advice of the two attorneys holding no official relation to the county board relieved the members of the board from all personal or criminal responsibility. We do not think the trial court erred in refusing to instruct the jury to acquit the defendants if they "had reason to believe that the advice and counsel upon which they relied were honestly and conscientiously given." In *The State, ex rel., v. Scates*, 43 Kas. 330, Mr. Justice VALENTINE, concurring in the prevailing opinion, observed: "If the members of the board had been prosecuted under § 3 of the act to restrain the issuing of county warrants, and found guilty, they would and should, in my opinion, have been removed from office."

III. The further contention, against the form of the information and the evidence in supporting the counts thereof, is more serious. We do not think that, when no account is filed or presented and a county warrant or order is unlawfully issued, such unlawful act may be divided into three or

four distinct offenses. In this case, no account, claim or demand for any sum was filed or presented to the board of county commissioners for allowance. Without any written proposition being presented, or anyone appearing at the meeting of the board for the subscribers to the Lake City bridge, the order complained of was made. Strictly speaking, the order was not the allowance of an account, claim, or demand. It was merely an offer by the board to purchase the bridge from private persons, some 78 in number. No acceptance of this offer was filed by the subscribers to the Lake City bridge, and the only person who seems to have been benefited by the order is R. Lake. Under these circumstances, we do not think any offense was established against either of the defendants, upon the evidence introduced, for the allowance of excessive sums on an account, claim, or demand, under ¶ 1888, or for the allowance of an unverified account, under ¶ 1647. It is suggested, however, that the first count of the information states an offense under ¶ 1888 and other sections. It is not usual to describe, in the same count, an offense under different sections. The offense charged in the first count, in our opinion, was attempted to be brought within the terms of the first clause of ¶ 1888. If that count had contained the allegation, that the county board had issued the county warrants or orders therein provided for, and thereby completed the fraud, we think both of the defendants might have been punished under ¶ 2346. But in that case there could have been one conviction only for the unlawful act or fraud of the defendants. The information, however, seems to have charged the defendants in seven counts under the different provisions of ¶ 1888, and in four counts under the provisions of ¶ 1647.

IV. The sixth, seventh, eighth, ninth, tenth and eleventh counts charged the unlawful issuance of county warrants or orders without a verified or other account having first been presented, as prescribed by ¶ 1888. To issue county warrants or orders means "to send out; to deliver; to put forth; to put into circulation; to emit—as, to issue bank notes, bonds, scrip," etc. A county warrant or order is "issued" when made out and placed

in the hands of a person authorized to receive it, or is actually delivered or taken away. So long as a county warrant or order is not delivered or put into circulation, it is not "issued," within the terms of ¶ 1888. If a warrant or order, unlawfully directed to be issued by a board of county commissioners, remains in the hands of the county clerk, and is not delivered or sent out or put into circulation by the county clerk, or anyone else, the wrong attempted by the unlawful act does not succeed, because there is no actual issuance of the warrant or order. The trial court, therefore, should have given the instructions prayed for concerning the nondelivery and noncompletion of the county warrants or orders; but the refusal of those instructions was not prejudicial to D. L. Pierce, under the sixth count of the information, because the evidence is undisputed that the warrant or order to R. Lake was actually delivered. F. A. Lewis, the county clerk, called by the state, testified as follows:

"Ques. Now, I'll ask you what was done after that concerning the purchase of these bridges, if anything? Ans. I do n't think there was anything more done that day.

"Q. What was done after that? A. The next morning I commenced drawing scrip for the bridge.

"Q. At whose instance did you commence drawing scrip for the bridge? A. At the request of D. L. Pierce.

"Q. What time in the morning was this? A. Some time between the hours of eight and nine o'clock in the morning.

"Q. Now, Mr. Lewis, you testified that after the signing up by defendant Pierce of this scrip for $1,738.68 he presented an order to you, signed by R. Lake, for the scrip; that he immediately took this scrip and left the office. That is right, is it? A. Yes, sir.

"Q. Now you may state what other warrants were signed by D. L. Pierce, as chairman of the board of county commissioners? A. If I remember right, there were nine others that were written up and signed just as they appear on that subscription list.

"Q. Were they the nine succeeding the name of R. Lake, as appears upon that omnibus order marked 'Exhibit D?' A. The nine succeeding amounts there.

"Q. Were each of those warrants signed by D. L. Pierce,

chairman of the board of county commissioners?   A. Yes,
sir.

"Q. Where are those warrants now, if you know, Mr.
Lewis?   A. I have the remainder of them in my office—
the nine.

"Q. The R. Lake warrant was the only warrant, then,
that was ever taken away from your office?   A. Yes, sir.

"Q. The amount of that was how much?   A. $1,738.68,
I believe."

As the only warrant or order for the purchase of the Lake
City bridge ever delivered or put in circulation was the war-
rant or order for R. Lake, the only count in the information
concerning the unlawful issuance of a county warrant or order
supported by the evidence is the sixth count thereof.

Our conclusion upon the whole record is, that the only of-
fense in the information which is sustained by the evidence is
the charge of the unlawful issuance of the county warrant or
order in favor of R. Lake, for $1,738.68, without any account
having been presented as prescribed by the statute to the
board of county commissioners.   In our opinion, upon the
allegations of the information, the evidence does not support
the conviction of James Stranathan for unlawfully allowing
accounts, claims, or demands, or for allowing excessive sums
thereof, for the reasons before stated.   It appears from the
record that the state dismissed all the counts after the fifth
against Stranathan.   Upon the sixth count, D. L. Pierce was
properly convicted, upon the admitted facts.   Upon such con-
viction, he was subject to a fine of not less than $10, or more
than $10,000; he was sentenced, however, to pay a fine of
$50 only.   The judgment of the district court will be re-
versed as to James Stranathan, and the judgment against D.
L. Pierce will be modified, affirming his sentence upon the
sixth count, and reversing all the other sentences.   The costs
against Pierce will be retaxed.

All the Justices concurring.