## CATTLEMEN'S TRUST CO. OF FT. WORTH v. TURNER. (No. 8287.) *

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 11, 1915. On Motion for Rehearing, Jan. 15, 1916.)

1. CORPORATIONS ⊜⟹99—STOCK SUBSCRIPTION —"ISSUE"—STATUTES.

Stock was subscribed for, and at the same time two notes given to the promoter for the corporation, one for part of the subscription price payable to the promoter and realized upon by him, and the other for the balance payable to the corporation and attached to which was an agreement that the stock subscribed for be held as collateral security for the note. At the same time it was agreed between the promoter and the subscriber that the stock and certificate were to be held until the notes should be paid, which was accordingly done, but in the meantime the stock was voted in the subscriber's name under proxy contained in the subscription contract, dividends declared upon it and credited upon the note, and the subscriber notified by the corporation from time to time of its condition, meetings, etc. *Held*, in an action upon the note, that it was valid and given in a valid transaction, and that the stock was not delivered and did not "issue" within the meaning of Const. art. 12, § 6, and Vernon's Sayles' Ann. Civ. St. 1914, art. 1146, prohibiting corporations from issuing stock except for money paid, labor done, or property actually received, because the transaction constituted but a subscription to stock with a future promise to pay, which is not prohibited by the constitutional and statutory provisions stated.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 444–446; Dec. Dig. ⊜⟹99.

For other definitions, see Words and Phrases, First and Second Series, Issue.]

2. CORPORATIONS ⊜⟹123—PLEDGE OF STOCK.

Such a transaction vests the subscriber with but a qualified right to the stock, not capable of being pledged.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 481, 491, 507–512, 537, 539–546, 569, 618; Dec. Dig. ⊜⟹123.]

3. CHATTEL MORTGAGES ⊜⟹17 — CORPORATE STOCK.

Such a transaction vests the subscriber with but a qualified right to the stock, not capable of being mortgaged.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 55–58; Dec. Dig. ⊜⟹17.]

4. CORPORATIONS ⊜⟹77—STOCK SUBSCRIPTION —CONSTRUCTION.

A stock subscription agreement, a note, and an agreement attached thereto to hypothecate the stock subscribed, all simultaneously executed and delivered, constitute but a single subscription contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 210–212, 219–243, 255; Dec. Dig. ⊜⟹77.]

---

⊜⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Application for writ of error pending in Supreme Court.

**5. CORPORATIONS ⊙⟶94 — STOCK — "CERTIFI-CATE OF STOCK."**

A "certificate of stock" is not the stock itself, but an acknowledgment of the interest of the shareholder in the corporate property, and operates to transfer nothing to the shareholder, but merely affords him evidence of his rights.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 435; Dec. Dig. ⊙⟶94.

For other definitions, see Words and Phrases, First and Second Series, Certificate of Stock.]

**6. CORPORATIONS ⊙⟶99 — STOCK SUBSCRIP-TIONS—STATUTES—CONSTRUCION.**

The purpose of Const. art. 12, § 6, and Vernon's Sayles' Ann. Civ. St. 1914, art. 1146, prohibiting corporations from issuing stock except for money paid, labor done, or property actually received, is to insure for the protection of the purchasing public an equivalent in corporate property for such stocks or bonds of the corporation as are emitted or circulated, and thus made a commodity of purchase.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 444–446; Dec. Dig. ⊙⟶99.]

**7. APPEAL AND ERROR ⊙⟶1011—INFERENCES FROM FACTS.**

Mere conclusions or inferences from facts, which are not findings of fact upon conflicting evidence as contemplated by statute, will not be approved.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3983–3989; Dec. Dig. ⊙⟶1011.]

On Motion for Rehearing.

**8. APPEAL AND ERROR ⊙⟶1095—OVERSIGHT OF UNDISPUTED FACTS—PREJUDICIAL ERROR.**

An oversight of undisputed facts in reviewing the evidence does not constitute prejudicial error, as such facts may be considered by the Supreme Court with or without a finding by the Court of Civil Appeals.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4268, 4329, 4330; Dec. Dig. ⊙⟶1095.]

Appeal from District Court, Tarrant County; J. W. Swayne, Judge.

Action by the Cattlemen's Trust Company of Ft. Worth against Robert Turner. Judgment for defendant, and plaintiff appeals. Reversed and rendered.

A. H. Kirby, of Abilene, for appellant. Madden, Trulove, Ryburn & Pipkin and Kimbrough, Underwood & Jackson, all of Amarillo, for appellee.

CONNER, C. J. This suit was instituted by the appellant, the Cattlemen's Trust Company, against the appellee, Robert Turner, upon a promissory note for the sum of $7,500, payable to the plaintiff on or before June 1, 1914, bearing interest at the rate of 8 per cent. per annum from its date, and containing the usual provisions for 10 per cent. additional as attorney's fees. Credits of $150 on December 13, 1913, and of $300 on December 31, 1914, were admitted in the petition. The defendant admitted the execution of the note, but, among other things, specially alleged that it had been given in payment for 500 shares of the capital stock of the plaintiff corporation then sold and delivered to him. It was charged that such transaction was illegal and void.

The plaintiff denied that the note had been executed and delivered as a part of an illegal and void contract or transaction, but charged that the defendant subscribed in writing for 500 shares of the capital stock of plaintiff company at and for the sum of $10,-000, which defendant promised to pay plaintiff for said stock; that to evidence the time when said sum of $10,000 was to be paid, and as a part of the same transaction by which the defendant subscribed for the stock, the note sued upon was given, as also another note for $2,500, which has since been paid; that the contract provided that the stock should be paid for at the time stated in the notes, but that said stock was not to be delivered to, or become the property of, the defendant until it had been fully paid for in cash in accordance with the contract, and that it should then, and not before, be issued and delivered; that pursuant to the contract no part of the stock had ever been issued or delivered to the defendant, nor to any one for him, and has never been in his possession, control, or custody, but has at all times since said contract of subscription been in the exclusive custody, control, and keeping of the plaintiff.

The case was tried before the court without a jury, resulting in a judgment denying plaintiff a recovery, etc. The court filed his conclusions of fact and law, and we now have the case before us for revision upon the assigned errors. The vital question presented on this appeal is: Did the appellant company issue to the defendant the stock contracted for by him, receiving in payment therefor the note in controversy, in violation of article 12, § 6, of our Constitution, which reads:

"No corporation shall issue stocks or bonds, except for money paid, labor done, or property actually received, and all fictitious increase of stock or indebtedness shall be void."

We have a statute also of like effect. See article 1146, Vernon's Sayles' Texas Civil Statutes. The contention of appellant is that none of its stock was ever issued to appellee. The reverse of this contention is urged by appellee, his insistence being that the stock mentioned in the pleadings was issued to him in consideration, in part at least, of the note sued on, and that therefore said note is void. The court adopted appellee's theory of the facts, and rendered judgment accordingly.

We think it may be safely said that there is no material conflict in the evidence. In all material respects we view the facts as substantially undisputed. As shown by the court's findings and the undisputed evidence, appellant was a private corporation chartered and organized under the laws of Texas, with its domicile at Ft. Worth, where it has been engaged in business since about December 1, 1912; that on or about the 12th day of May, 1913, the plaintiff, through its authoriz-

ed agent, J. B. Martin, solicited and procured from the defendant, Turner, a written subscription signed by him for 500 shares of capital stock of the plaintiff corporation of the par value of $10,000; said signed subscription containing, among other things, the following terms, to wit:

### "Subscription for Stock.

"No. Shares, 500.      Amount, $10,000.00.

"This is to certify that I hereby subscribe for five hundred shares of the capital stock of the Cattlemen's Trust Company, Ft. Worth, Texas, for which I agree to pay ten thousand dollars to said company.

"I further agree that this application and contract constitutes the sole and entire agreement, representation, and warranty between us, and that the said company reserves the right to reject this subscription within twenty days from receipt thereof and return to the subscriber the full amount paid said company, and further that 25 per cent. of the sale price of the stock herein purchased is to be and will be expended for organization and promotion expenses, to which I expressly agree and hereby authorize.

"I hereby make, constitute, and appoint A. L. Camp, of Ft. Worth, Texas, as my true and lawful attorney to represent me and to vote my proxy, and I hereby ratify and confirm the acts of my said attorney until hereafter annulled by me in writing. This proxy is revocable at my pleasure."

At this same time, and as a part of the same transaction, the defendant, Turner, executed and delivered to the said agent, Martin, for the plaintiff corporation, two promissory notes, one for the principal sum of $2,500, being one-fourth of the subscription or sale price of said shares of stock payable to the said J. B. Martin, and which he afterwards collected as commission due him for obtaining the subscription. The other note was for the principal sum of $7,500, and is the note declared upon in this suit. Attached to said $7,500 note, and constituting a part thereof, was the following collateral agreement, viz.:

"As collateral security for the foregoing note, and other notes, if any, this day given for the stock hereinafter named, I have delivered to the said the Cattlemen's Trust Company the following securities: 500 shares of the Cattlemen's Trust Company of Ft. Worth.

"In case of default in the payment of any of the foregoing and above described notes at maturity, I, we, or either of us authorize the holder of said notes to sell said securities, with or without notice, at public or private sale, at the option of the holder, applying the proceeds to the payment of the above notes, including interest and attorney's fees, and the surplus, if any remaining, thereafter to be paid to the maker hereof on demand.      Robert Turner."

Both the notes last mentioned and the collateral agreement were executed, as stated, at the same time, and at the same time delivered by the defendant, Robert Turner, to the plaintiff's agent, J. B. Martin, who thereafter duly delivered the same to the plaintiff corporation at its office in Ft. Worth. The subscription contract and collateral agreement were accepted by the plaintiff corporation, which thereupon made out and attached to the note for $7,500 the following certificate, viz.:

"Incorporated under the Laws of the State of Texas.

"No. 186.      Shares, 500.

"The Cattlemen's Trust Company of Ft. Worth.

"Authorized Capital Stock, $1,000,000.00.

"This certifies that Robt. Turner is the owner of five hundred shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth, full-paid and none assessable, transferable only on the books of the corporation by the holder hereof in person or by attorney upon surrender of this certificate properly indorsed.

"In witness whereof the said corporation has caused this certificate to be signed by its duly authorized officers and to be sealed with the seal of the corporation this 12th day of May, A. D. 1913.

"J. W. Milner.      A. H. Kirby,
"Asst. Secretary      Vice President.
"[Seal.]      Shares.
"$10.00."

The certificate was indorsed upon the back with the following:

"Certificate for 500 shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth.

"Issued to Robt. Turner.

"Dated May 12th, 1913."

It was agreed between Turner and the plaintiff, through its said agent, Martin, at the time the subscription contract and the notes hereinbefore mentioned were signed and delivered, that the plaintiff corporation should have and retain the possession of the stock to be issued to Turner as collateral security for the note sued upon, and Turner was informed at that time by said Martin that the certificate for stock would not be delivered to him until said note was paid. In accordance with this agreement and understanding, the physical custody of the certificate mentioned has been at all times, and still is, with the plaintiff corporation. It further appears that on September 2, 1913, at a meeting of the stockholders of plaintiff corporation, A. L. Camp, as proxy for the defendant, voted said 500 shares of plaintiff's capital stock in accordance with the provision contained in the original subscription agreement. It also appears that yet later, in December, 1913, a dividend of $150 was declared by the plaintiff corporation on said 500 shares of stock, and entered by plaintiff corporation as a credit upon the note sued upon. Yet later, in December, 1914, another dividend for $300 was declared by the plaintiff corporation upon said 500 shares of stock, and likewise entered by the plaintiff as a credit upon said note. It also appears that the plaintiff corporation entered upon its stock book or record of subscriptions the name and the address of defendant in connection with said certificate No. 186, for 500 shares, showing the date of the certificate to be May 12, 1913, the amount, $10,000, amount of cash paid, none, notes, one for $2,500, and one for $7,500, and salesman J. B. Martin; this being all that the books of the plaintiff corporation showed in the nature of an account with the defendant. It further appeared that the defendant from time to time, un-

til about the time of the institution of this suit, received letters from the plaintiff corporation showing the condition of the company, receiving notices of stockholders' meetings, and of the first dividend mentioned, etc.

The trial court further found, as differences evidently from the facts hereinbefore stated, that the certificate for stock had been "issued"; that at the time of the execution of the stock subscription contract and note mentioned it was the intention of Martin and the defendant that the plaintiff corporation "should hold such certificate as defendant's property subject to plaintiff's lien"; that the only consideration for the two notes mentioned "was the sale by the plaintiff to the defendant of 500 shares of capital stock of the plaintiff corporation; * * * that the defendant did not pay to the plaintiff, nor did the plaintiff receive from the defendant, either at the time of the transaction between the plaintiff and the defendant, May 12, 1913, or at any subsequent time, any money paid, labor done, or property actually received." The court further concluded "that it was the intention and agreement of the parties that the plaintiff should sell to the defendant, and that the defendant should buy from the plaintiff, the 500 shares of plaintiff's capital stock, all on a credit, and that the plaintiff should accept in exchange or payment for said shares the two notes referred to, and that the defendant should become the present owner of the shares of stock, unless the plaintiff rejected the defendant's subscription and returned the notes," which was not done. There were other inferences and findings of like effect by the trial court, but nothing, we think, that substantially adds to or takes from the legal effect of the facts as we have found them; the court concluding, however, on the whole, that the transaction amounted to a sale of the stock upon a credit, it being held that the manual delivery of the certificate was not essential to the ownership of the shares or to the issuance of the stock. Judgment was accordingly entered in favor of the defendant, as stated in the beginning of the opinion.

[1-4] We recur to the question: Did the plaintiff corporation "issue" to the defendant shares of its capital stock within the meaning of the constitutional and statutory provisions hereinbefore referred to, and receive as payment therefor the promissory note sued upon in this case? We think not. It is undoubtedly true that one may lawfully subscribe for shares of capital stock of a corporation and lawfully promise to pay therefor at a future date; the inhibition of our constitutional and statutory provisions being that the stock shall not be really issued by the corporation until it has been paid for. It is said in section 65, 1 Cook on Stock and Stockholders and Corporation Law (3d Ed.):

"Upon general common-law principles any one who is competent to enter into any ordinary contract may make a valid subscription for stock in an incorporated company. A subscription for stock is a contract; and, in general, any one who can contract may subscribe."

Further authorities might be cited to the effect that the note in controversy in this suit in legal effect added nothing affecting the question under consideration to defendant's promise to pay as contained in the subscription contract which is also declared upon in appellant's pleadings. The subscription agreement, the notes, and attached collateral agreement were all executed and delivered at the same time, and severally constituted parts of a single whole, to wit, a subscription agreement, which, as already observed, may be lawfully made. The principal office of the notes under the circumstances was to fix the time of the payment of the sum promised in the subscription agreement. Under the circumstances, too, what is designated in the record as a collateral agreement to hypothecate the stock was, in a legal sense, meaningless and of no effect now necessary to consider. Until after delivery to the defendant, or to some one capable of receiving it for him, the certificate, or stock, if it should be so classed, which was attached to the note declared upon, constituted no tangible right of the defendant capable of being the subject of a pledge or chattel mortgage. While appellee, Turner, may have had, and doubtless did have, for some purposes and as against some persons, a qualified interest in or right to the stock for which he subscribed, yet in truth, as we think, such stock has never been issued to him within the meaning of the constitutional provision quoted. True, appellee testified that he "understood the shares were to be issued at once and held as collateral" for the notes, and that he signed both the notes and the subscription contract upon that agreement, and, in effect, that he considered himself as the owner of the stock; yet he further testified that he never was a director or officer in the corporation, or sustained any relation thereto, save that arising from his subscription contract and notes; that he never saw this certificate or stock until it was produced in court and never had it in his possession; that it was a fact that "Capt. Martin stated the certificate would be delivered to me when I paid the notes in full"; that when he paid the $2,500 note he "never demanded of any one the delivery of the stock, or any part of it, as it was to be held as collateral for the notes, and it was my understanding the stock was not to be delivered until I had paid the notes in full." He again testified:

"I never demanded delivery of this stock, because it was agreed from the start that they were to hold the stock until payment of the notes."

Mr. Martin's testimony was to the same effect. Mr. Camp testified without contradiction that:

The certificate of stock in question, "like all others, was written up at once as a matter of convenience and to save bookkeeping. Otherwise we would have had to keep an account with each stockholder; but by writing up the stock and attaching thereto the notes the notes were entered on the bills receivable, and, when the dividends were paid, it was only necessary to enter it on the backs of the note, and thus not keep a separate account with each stockholder, and the stock was ready to be delivered when the notes were paid in full. * * * This certificate was never out of the possession of the trust company until it was exhibited here in court this morning. The Cattlemen's Trust Company never received any part of the $2,500 note, nor has it received payment of any part of the principal or interest of the $7,500 note."

[5] The trial court evidently concluded as an inference from the facts pleaded that the certificate of stock mentioned in the testimony was "stock" of the corporation, and that the signing thereof, tearing it out of the stock book, and attaching it to the defendant's note was a "delivery" of such character as to constitute an issuance of the stock. Mr. Cook, the same author hereinbefore referred to, in the second edition of his work (section 10), says:

"A certificate of stock is from one point of view a mere muniment of title, like a title deed. It is not the stock itself, but evidence of the ownership of the stock; that is to say, it is a written acknowledgment by the corporation of the interest of the shareholder in the corporate property and franchises; it operates to transfer nothing from the corporation to the shareholder, but merely affords to the latter evidence of his rights. It should be clearly apprehended that the certificate is not the stock, but merely written evidence of the ownership of shares. Accordingly it follows that shares have no 'earmarks,' that one share cannot be distinguished from another share, but that it is only the certificates which are distinguishable one from the other by their number and in other ways. The certificate, therefore, has value in itself only as evidence, and, apart from the shares which it represents, it is utterly worthless. And even as evidence it is not in every case essential; it is merely a convenient voucher, which the shareholder has a right to receive if he asks for it. One element of its value to the shareholder is that it is prima facie evidence of his title."

But, if the certificate in question should receive a more liberal construction and be considered as stock, it cannot be said that it was delivered to the defendant either actually or constructively. It never passed out of the hands of the appellant corporation. This is conceded. It is said by our Supreme Court in the case of Tyler Building & Loan Ass'n v. Biard & Scales (Sup.) 171 S. W. 1122, that a deed delivered by the grantor to his agent for delivery to the grantee in accordance with specific instructions is not in escrow while in the hands of the agent. In speaking of "delivery" in the law of sales, it is said in 35 Cyc. pp. 188, 189:

"The word 'delivery' in the law of sales may signify either an actual or a constructive delivery. Actual delivery consists in giving to the buyer or his servants or accredited agent the real possession of the goods sold. Constructive delivery comprehends all of those acts which, although not truly conferring real possession of the goods sold, have been held constructione juris equivalent to acts of real delivery, and in this sense includes symbolical or substituted delivery. Both actual and constructive delivery contemplate the absolute giving up of the control and custody of the goods on the part of the seller and the assumption of the same by the buyer."

So that, as it seems to us, it cannot be said that the certificate for stock issued in the name of the defendant, even treating it as stock of the corporation, was delivered, in a legal sense, to the defendant so as to pass to him anything other than some contingent, qualified right. The certificate at all times, as shown by the undisputed testimony, remained with the corporation, subject to its exclusive control, and could not have been effectively sold, transferred, or circulated in any way by the defendant. It certainly cannot, as we think, be said to have been "issued" within the terms of the inhibiting constitutional provision. The term "issue" is thus defined in Webster's Unabridged Dictionary:

"To send forth or give out officially; delivered by authority; give to the public; as, to issue money, ammunition, or commands; to issue a journal; to bring to a conclusion or final issue; settle."

A number of constructions of the term are also given in 4 Words and Phrases, 3778, 3779. We will refer to but a few of them to illustrate our conclusions. It is there said:

"The word 'issued' ordinarily means 'emitted' or 'sent forth,' and, in the absence of other definition, that must be taken to be the sense in which it was used in the legislation of Kansas." Corning v. Meade County Com'rs, 102 Fed. 57, 60, 42 C. C. A. 154.

"The terms 'issued' or 'put in circulation,'" in a statute providing that no banking association shall issue or put in circulation any bill or note, "have a restricted, special, and almost technical meaning relating exclusively to the money currency of the country, or, in the language of the general banking law, to 'circulating notes in the similitude of banking notes.'" Curtiss v. Leavitt, 17 Barb. (N. Y.) 309.

"The term 'issue,' as used in the Negotiable Instruments Law, means the first delivery of the instrument, complete in form, to a person who takes it as a holder"—citing the statutes of Massachusetts, Ohio, Virginia, and North Dakota.

"In financial parlance the term 'issue' seems to have two phases of meaning. 'Date of issue,' when applied to notes, bonds, etc., of a series, usually means the arbitrary date fixed as the beginning of the term for which they run, without reference to the precise time when convenience or the state of the market may permit of their sale or delivery. * * * When the bonds are delivered to the purchaser, they will be 'issued' to him, which is the other meaning of the term." Yesler v. City of Seattle, 1 Wash. 308, 25 Pac. 1014.

"The ordinary and commonly accepted meaning of 'to issue' is to send forth, to put into circulation, to emit, as to issue bank notes, bonds, etc. * * * To issue tax bills, then, as ordinarily understood, necessarily includes delivery to some one; just as municipal bonds may be written out or printed and signed, but they are not issued until sent out, delivered or

put into circulation. And, where tax bills are to be given to a contractor for a public improvement, and are prepared for delivery to the contractor, they are issued when he takes the same and gives his receipt on the face of the register of the engineer, whose duty it is to register the same in his office." Folks v. Yost, 54 Mo. App. 55.

"A county warrant or order is 'issued' when made out, and placed in the hands of a person authorized to receive it, or is actually delivered or taken away. So long as a county warrant or order is not delivered or put into circulation, it is not 'issued.' * * * If a warrant or order unlawfully directed to be issued by a board of county commissioners remains in the hands of the county clerk, and is not delivered, or sent out, or put into circulation, by the county clerk or any one else, the wrong attempted * * * does not succeed, because there is no actual issuance of the warrant." State v. Pierce, 52 Kan. 521, 35 Pac. 19.

Other definitions of like import are given by the authority referred to, but we have quoted sufficiently, we think, to illustrate the conclusion already stated that, in our opinion, the stock in the appellant corporation for which the appellee contracted was never, in fact, issued to him in violation of the constitutional and statutory provisions on the subject. We think this conclusion is also supported by a number of our own authorities. Thus, in the case of Cope v. Pitzer, by this court, 166 S. W. 447, Cope, among other things, subscribed for ten shares of the capital stock in the Wichita Southern Life Insurance Company, agreeing to pay therefor the sum of $2,500, evidenced by two promissory notes, one of which was payable to S. A. Pitzer, who solicited the subscription for and on behalf of the company. Pitzer instituted suit upon the note executed to him, and recovered judgment thereon. Among other findings of the trial court not necessary to state, was the following:

"The said company delivered no stock to the defendant on the execution of said contract and notes, and no stock has been delivered to defendant thereon, and said company has not agreed to deliver any stock thereon until said note for $2,000 is paid in full, and demands payment of said note as a prerequisite for issuing said ten shares of stock, or any part thereof, to defendant, but said company stands ready to deliver to the defendant said ten shares of stock on payment of said note for $2,000."

We held, as did the lower court, that the subscription contract was valid and the notes enforceable.

In Horn Bros. v. Baker, 173 S. W. 474, it appears by the opinion of the Galveston Court of Civil Appeals that the defendants subscribed for stock in a proposed corporation, and in evidence of their agreement thereof executed a note secured by a chattel mortgage, but there was no agreement on behalf of the corporation to sell and deliver the stock on their promise to pay therefor, and the stock was not, in fact, delivered. The court upheld the validity of the note, saying:

"We shall not discuss appellants' assignments of error in detail. The evidence, when analyzed, shows that no agreement was made with Horn Bros., at the time they subscribed or afterwards, to sell and deliver to them the stock upon their promise to pay for it. No fraud was practiced to induce their subscription. They, just as the other subscribers, subscribed for so much of the capital stock of the proposed corporation. When the charter was issued and the corporation accepted the promise of Horn Bros. to pay for the five shares, their liability evidenced by the subscription was complete. The execution of the note was only another expression or admission of liability, and was of no greater dignity than the contract of subscription would have been had the note not been given, in so far as it affects the liability of the corporation's subsequent creditors; for, having been executed as a part of the same transaction, the note and subscription contract evidenced one contract only, and that was to take and pay for the stock. That such a transaction does not contravene section 6 of article 12 of the Constitution we think clear, and are sustained in this conclusion, we think, by the following authorities: Street Railway v. Adams, 87 Tex. 125, 26 S. W. 1040; McCarthy v. Texas Loan & Guaranty Co., 142 S. W. 96; Houston Fire & Marine Ins. Co. v. Swain, 114 S. W. 154."

The same court, in the case of F. & M. State Bank v. Falvey, 175 S. W. 833, upheld the validity of a subscription and notes by Falvey very similar in character to those here under consideration, notwithstanding the fact that in that case the note there under consideration had actually passed out of the hands of the corporation into the possession of the bank. It is true that another one of the same series of notes involved in the consideration of the case last above referred to was declared to be invalid by the Court of Civil Appeals at El Paso in the case of Sturdevant v. Falvey, 176 S. W. 908, on the ground that the transaction was violative of the constitutional provisions and statute here under consideration. The El Paso court referred without disapproval to the cases upholding a mere subscription contract between the parties where there had not been an issuance and delivery of the stock, and distinguished the decision by the Galveston court above referred to on the ground evidently that in the El Paso court case then under consideration the agreed facts of that case showed "that the stock for which the note was given was issued and delivered to Falvey."

[6] By the common law of the land owners of stock in corporations are entitled to a ratable share in its assets, and the evident purpose of the constitutional and statutory provisions under consideration was to protect the purchasing public in the acquisition of stock or bonds of corporations that was not represented by an equivalent in the way of assets belonging to the corporation issuing the stock, and it is not easy to apprehend in what way, under the circumstances of this case, the stock market of the country can be demoralized or a purchaser therein injured. It is clear that what is designated as the stock in the case before us was not "emitted," circulated, or issued, so as to become the subject of a commodity on the

market, nor was it in the power either of the corporation or of the defendant, Turner, to so place the stock in circulation. The substance of the transaction, as we have before indicated, seems rather to have been a mere contract for the acquisition of stock by the defendant, Turner, which, for aught that appears in the record, was of value to him; it not appearing that the appellant corporation was insolvent, or that its stock was worth less than its face value. It was a contract which, upon payment, or tender of payment by him, he would have been entitled to enforce, and likewise a contract, which in turn may, as we think, be enforced by the corporation.

[7] There are a number of what purport to be findings of fact which are attacked by appellant, and which seem to be at variance with the facts as we have stated them, but, as before indicated, we think them mere conclusions or inferences from facts not to be classed as findings of fact upon conflicting evidence, as contemplated by our statutes on the subject, and therefore they are not approved. The fact that appellee understood that the stock was owned by him, and that in some respects he was so treated by appellant, cannot alter the undisputed fact that the stock was not issued or delivered to him, nor was it so agreed. No amount of verbal manipulation can disguise or alter the legal effect of the undisputed facts in this case, and upon such facts we think the judgment below must be reversed, and here rendered for appellant, for the reasons hereinbefore given.

Reversed and rendered for appellant.

On Motion for Rehearing.

[8] Counsel for appellee have presented a lengthy motion for rehearing which we have endeavored to consider with all of the care such a painstaking and able presentation merits. We, however, believe that in our original opinion we made a fair statement of the substantial facts upon which the rights of the parties in the case depend, and therefrom drew the proper legal conclusions. It is well settled that we need not set out the evidence upon which our conclusions of fact are based, and if by inadvertence we overlooked any "undisputed fact," it will not operate to appellee's prejudice before the higher reviewing tribunal, inasmuch as our Supreme Court may consider "undisputed" facts with or without finding on our part. See Biano Co. v. Hollingsworth, 91 Tex. 49; Stewart v. Robbins, 27 Tex. Civ. App. 188, 65 S. W. 899; Rountree v. Thompson, 30 Tex. Civ. App. 595, 71 S. W. 574, 72 S. W. 69; Vansickle v. Watson, 103 Tex. 37, 123 S. W. 114.

The motion for rehearing and the additional findings is accordingly overruled.