*393 OPINION.
Mellott :
The first question is whether respondent erred in including in petitioner’s income the fair market value of the stock released from escrow and delivered to him in 1935. This question may be answered by determining whether petitioner owned the shares prior to their delivery to him in that year.
Petitioner contends that ownership vested in him on June 9, 1919, when certificates for 1,000 shares were issued; that the consideration for the issuance of the shares was the execution by him of the distribution agreement of February 9, 1919; that the ¿liares were placed in escrow merely as security for the performance of his part of the contract; that the “dividends” were impounded “to encourage compliance by each artist with his distribution contract”; that he was regarded by the corporation as the owner, at all times, of the stock and “exercised all incidents of ownership”, except physical possession; and that he realized no taxable income when the stock was released from escrow and delivered to him.
Respondent determined that “the fair market value of the 334 shares * * * received * * * in the taxable year which value has been determined to he $104,709, represents income taxable to [petitioner] under the provisions of section 22 (a) of the Revenue Act of 1934.” In support of- this determination respondent places considerable reliance upon the provisions of the agreement of August 5, 1919 (escrow agreement); contends that the entire record shows petitioner was not the owner of the 334 shares until they were released and delivered to him in 1935; argues it was the intention of the parties, as indicated by the various exhibits, that petitioner should not become the owner of the stock until and unless the photoplays were delivered; and insists that petitioner acquired no vested interest in it until he delivered *394 the photoplays according to his agreement. The value of the stock at the time it was released from escrow and delivered to petitioner is not contested.
Title to personal property generally passes when the parties to a transaction intend that it shall pass. United States v. Utah, Nevada & California Stage Co., 199 U. S. 414. Intention is primarily a question of fact. In determining it the agreements which they signed, if unambiguous, are entitled to great weight, though consideration may also he given to the circumstances under which they were executed, the objects sought to be accomplished, the interpretation placed upon them by the parties prior to the controversy in issue, and any and all relevant facts and circumstances tending to show what the actual intention was. The basic facts, which are not seriously in dispute, are shown in our| findings. No attempt will be made to summarize them. Brief allusion will, however, be made to some of them.
On February 5, 1919, petitioner and other artists, for reasons immaterial here, agreed in writing to become associated in the organization of a corporation for the purpose of exploiting, distributing, and exhibiting motion pictures produced by them. This agreement provided that 1,000 shares of the common stock of such corporation should be issued to each of the parties and paid for “in part consideration of the execution and fulfillment” by each of a contract pertaining to the exploiting, marketing, and distributing of his or her motion pictures. Pursuant to this agreement petitioner entered into a contract with the corporation for exploiting, marketing, and distributing 9 motion pictures to be produced by him, and an agreement with the corporation and an escrow agent was prepared and signed. These agreements set out the terms and conditions under which the 1,000 shares of common stock (which included the 334 shares here in question) were to be issued and delivered to petitioner. The terms and conditions were specific and definitely provided that petitioner should not receive any of the 1,000 shares of common stock unless and until he had produced and delivered one or more photoplays, and that all of the stock should be received when, ana only when he had delivered the required number of photoplays.
The later agreement of November 22,1924, is equally positive in its terms. Under it petitioner became “obligated to deliver to the corporation for distribution only five (5) additional photoplays, described in the original contract instead of eight (8) undelivered pictures provided for in said contract. The balance of the common stock of the corporation, which is now held in escrow for the benefit of Chaplin shall be delivered to him in the proportion of one-fifth (hs) thereof upon the delivery of each motion picture photoplay by Chaplin to the Corporation.” (One-sixth of the total 1,000 shares was delivered to petitioner leaving five-sixths in escrow.) This agree *395 ment was partially carried out and under it the escrow agent delivered three additional certificates of stock to petitioner prior to 1935. The other two — the two in issue in this proceeding — were released by the corporation and delivered to petitioner in September 1935.
The terms and conditions of the agreements briefly referred to above and the actions of the parties under them indicate, in our judgment, it was the intention of the parties that ownership of the stock should not pass to petitioner until and unless he “fulfilled” the terms and conditions of his contract and delivered to the corporation the photoplays stipulated therein. Tn reaching this conclusion we have not overlooked the fact that the corporation prior to 1935 treated petitioner, for many purposes, as the owner of 1,000 shares of its common stock. Clearly, all parties intended that he should ultimately become such owner; and, since he was permitted under the escrow agreement to vote the stock, it is not surprising that he was given the usual notice of meetings, participated in elections, and exercised other rights commonly exercised only by a stockholder. The right to vo'te corporate stock may be conferred by contract, as it was in the instant proceeding, even though no property in the stock has passed, cf. Cattlemen's Trust Co. of Ft. Worth v. Turner, 182 S. W. 438. Stock is frequently voted by persons having no beneficial ownership of it. Alger-Sullivan Lumber Co. v. Commissioner, 57 Fed. (2d) 3. Nor do we think that the recitation in the corporate resolution of May 29,1919, to the effect that the corporation was authorized to issue stock to the artists “in consideration of the delivery of [the distribution] contracts”, justifies a conclusion that the artists thereby became the “owners” of the stock; for the shares were to he held “in escrow in accordance with the provisions of said contracts” and were so held.
The whole idea of the enterprise was cooperative. The corporation was formed for the specific purpose of distributing pictures of the artists. Each agreed to execute a contract with the corporation for the exclusive right “to market, exploit, distribute and turn to account the motion pictures that each shall produce.” The contract ultimately entered into by petitioner with the corporation granted it “the exclusive right and privilege to market and turn to account, exhibit, distribute or cause to be distributed or exhibited” the pictures which he was to produce. “All moneys derived from the license to use” the pictures were to be divided 70 or 80 percent to the artist and 20 or 30 percent to the corporation. It is apparent the corporation would have no income unless the pictures, either those produced by petitioner or those produced by the other artists, were delivered to it for distribution and exploitation. The artists did not contemplate that one of them should share in the profits of the corporation — except to a limited extent as purchasers and owners of the preferred stock— unless he delivered his proportion of the pictures which were to pro *396 duce the income. The mere execution of the contract was not sufficient. The “fulfillment” of the contract was equally important. Indeed it was the very essence, the sine qua non of the contract, a condition precedent to petitioner acquiring either equitable or legal ownership of the common stock. Cf. United States v. Fourth National Bank in Wichita, Kansas, 83 Fed. (2d) 85. We are therefore of the opinion that petitioner’s contention, to the effect that ownership of the stock vested in him on June 9, 1919, is untenable. He became the owner of the stock in 1935 when it was released from escrow, by the corporation, and delivered to him. In this connection it may be pointed out that the escrow agreement required the depositary to hold the stock until “the corporation shall notify * * * [it] in writing that the artist is entitled” to receive it and this agreement was carried out.
Petitioner places considerable reliance upon the decision of the District Court for the District of New Jersey in Schneider v. Duffy, 43 Fed. (2d) 642, and E. L. Carnahan, 21 B. T. A. 893. The cited cases are, in our judgment, distinguishable upon their facts. In the first mentioned case there was a conditional assignment to the taxpayer of an equitable ownership in 1,500 shares of stock in consideration of his agreement to remain with the corporation for five years. He was “to receive and enjoy all dividends declared and paid from the date” of the assignment, including any distribution “of money, property, stocks or rights that the common stockholders * * * become entitled to * * One-fifth of the shares were to be delivered to him at the end of each year during the five-year period; but in the event of his death or refusal to carry out his obligation, the equitable assignment as to the undelivered stock was to be null and void. In deciding that the parties intended ownership of the stock to vest' when the contract was signed rather than when delivery was made at the end of the year, the court emphasized the fact that the taxpayer acquired a present, fixed right to the enjoyment of all the income of the property when the contract was- signed and that the parties had specifically agreed the undelivered stock was “intended only as collateral security” that the employee would carry out his obligation. In the instant case the dividends were to be held in escrow and delivered to the petitioner only when and if the stock should be delivered to him. Here, also the stock was not held as collateral security for the performance of petitioner’s obligation but remained the property of the corporation until “delivery by the artist to the corporation” of the photoplay as agreed.
In H. L. Carnahan, the petitioner, in 1922, had performed services entitling him to receive 5,000 shares of corporate stock. The stock was issued to him and he became entitled to receive all dividends and to exercise all rights as a stockholder; but the certificate was *397 required to be, and was, delivered in escrow pending further order of the “Blue Sky” Commissioner. The certificate was released and delivered to the petitioner in 1924 and the question before the Board was whether he was in receipt of income in the earlier year or in the later year. In holding that income was realized in 1922 it was pointed out that the taxpayer had received the stock in that year, had deposited it in escrow in accordance with the requirements of the state law, and “received all the benefits possible from * * * [it] except the right of actual physical possession and unrestricted power of sale * * *.” In the instant proceeding petitioner did not receive such “benefits” from the stock and could not receive them unless and until he complied with his obligation.
It is apparent we must hold, and we do hold, that petitioner became the owner of the 334 shares of stock in 1935 rather than in 1919. The following cases, in addition to those heretofore cited and discussed, tend to support this view. Martin D. Thomas, 44 B. T. A. 735; Charles F. Mitchell, 45 B. T. A. 300.
Issues (b), (c), and (d) require determination of the treatment to be accorded the accumulated dividends. Respondent contends that if petitioner was not the owner of the shares of stock prior to 1935, then the amount representing dividends declared on the stock prior to that date did not represent dividends to him. The gist of his contention seems to be that the sum paid over to petitioner was merely an additional amount paid for fulfilling the contract. The question is not free from doubt; but we think we are justified in resolving it in favor of petitioner. The amount deposited in escrow represented the portion of the earnings of the corporation allocable to the shares of stock which, under the contract, the parties intended should ultimately belong to petitioner. The contract provided that if and when the stock should be delivered to petitioner by the escrow agent, the corporation would pay to him all dividends which had been deposited in the trust account. This was done. If the amounts deposited in the trust account represented dividends — and they seem clearly to have been distributions by the corporation out of earnings or profits accumulated after February 28, 1913, and hence within the definition of a dividend contained in section 115 of the Revenue Act of 1934— then they did not lose their character as dividends merely because they were not actually delivered to petitioner in the year declared. The right to receive dividends may be assigned without making the assignee a stockholder, Roscoe E. Aldrich, 3 B. T. A. 911, 919; Anthony Schneider, 3 B. T. A. 920, 926; Matchette v. Helvering, 81 Fed. (2d) 73, though some question may arise as to the taxability of the dividends to the assignor under the rationale of such cases as Helvering v. Horst, 311 U. S. 112, and Helvering v. Eubank, 311 *398 U. S. 122. That question, however, is not before us. Both parties admit that the amount should be included in' petitioner’s income and the issue is solely whether it constituted dividends, as reported, or ordinary income. Since the amount set aside did not, in our opinion, lose its character as dividends, we think it was properly treated by the petitioner in his return. But if respondent’s view be accepted that the amounts set aside in each year were not true dividends, then it would seem that the action of the corporation in the taxable year, making them unconditionally available to petitioner, was tantamount to the declaration and payment by the corporation of a dividend in the aggregate amount of $44,532.22 upon the 334 shares which petitioner had just received. In either event, we are of the opinion that the amount was “received as dividends from a domestic corporation which is subject to taxation” under Title I of the Bevenue Act of 1934 and hence the credit for normal tax, as specified in section 25 (a) of such act, should be allowed.
The deficiency shall be recomputed in accordance with the views herein expressed and
Reviewed by the Board.

Decision will be entered it/nder Rule 50.